*In re* PETITION OF THE VILLAGE OF VERNON HILLS TO TRANSFER TERRITORY OF THE VERNON FIRE PROTECTION DISTRICT TO THE COUNTRYSIDE FIRE PROTECTION DISTRICT (The Village of Vernon Hills, Petitioner-Appellee, v. Vernon Fire Protection District, Objector-Appellant; Countryside Fire Protection District, Respondent-Affected District; Stephen T. Klein, Objector).

Second District    No. 2—93—0162

Opinion filed July 20, 1994.

David F. Holland and Anthony T. Buckun, both of Des Plaines, for appellant.

Richard A. Makarski, of Chapman & Cutler, of Chicago, Adeline J. Geo-

Karis, of Adeline J. Geo-Karis & Associates, of Zion, and James R. Hermann, of James J. Hermann, Jr., P.C., of Waukegan, for appellee.

JUSTICE QUETSCH delivered the opinion of the court:

The objector, the Vernon Fire Protection District, appeals following the denial of its post-judgment motion, arguing that the statute under which the trial court ordered the transfer of a certain portion of its fire protection district to another district was unconstitutional. We agree with the objector; we reverse and remand with directions.

In this cause, the petitioner, the Village of Vernon Hills (Village), sought to disconnect certain territory of the objector, the Vernon Fire Protection District (Objector), and transfer it to the respondent, the Countryside Fire Protection District (Countryside), which also provided fire protection to the Village. The Village relied on the disconnection provisions of section 14.14 of the Fire Protection District Act (Act) (70 ILCS 705/14.14 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 127½, par. 34.14, added by Pub. Act 87—825, § 4, eff. December 16, 1991)).

The Vernon Fire Protection District, the principal objector below and appellant here, initially sought unsuccessfully to dismiss the Village's petition pursuant to section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 1992)), arguing that the statute was unconstitutional as a special or local law which, by its own terms, was applicable only to a county having a population of between 500,000 and 750,000, namely, Lake County, Illinois. The Objector relied on *In re Belmont Fire Protection District* (1986), 111 Ill. 2d 373.

On October 14, 1992, concluding that the statute was constitutional, the circuit court denied the Objector's amended motion to dismiss the petition and set an evidentiary hearing on the Village's petition to transfer the territory to Countryside. (Stephen T. Klein, who appeared in the proceedings after the denial of the Objector's motion and ostensibly represented the interests of some residents of the territory opposed to the transfer, played a limited role as an objector and is not a party to this appeal.)

On October 30, 1992, the Objector filed its "Objection to Petition to Transfer Territory" again arguing that the statute was unconstitutional special legislation. Evidentiary hearings were conducted on November 6, November 24, and December 11, 1992, following which the trial court granted the relief sought by the Village to transfer the territory. On January 13, 1993, the trial court denied Objector's post-judgment motion which again urged that the statute in question was unconstitutional special legislation.

Objector filed this timely appeal, again challenging section 14.14 of the Act as unconstitutional special legislation. The statute in question reads:

"(a) In a county having a population of between 500,000 and 750,000, territory within the boundaries of a non-home rule municipality that receives fire protection services from more than a single fire protection district may be disconnected from one fire protection district and transferred to the district that provides services to the area comprising more than 80% of the municipality's assessed valuation. To disconnect that territory, the board of trustees of one of the affected districts, the corporate authorities of the municipality, or 5% of the owners of property within the territory to be disconnected may file a petition in the court in which the district (from which disconnection is sought) was organized, setting forth the following:

(1) The description of the territory sought to be transferred.

(2) A statement that:

(A) more than 80% of the assessed valuation of the municipality lies within one district;

(B) more than 90% of the residents of the municipality reside within that same district;

(C) the territory to be transferred contains less than 10% of the total assessed valuation and total number of residents of the affected district;

(D) the territory to be transferred consists of all the territory within the municipality serviced by the district from which disconnection is sought;

(E) the district to which the territory is to be transferred agrees to the transfer, as evidenced by passage of a resolution by its board of trustees;

(F) the transfer will not impair the ability of the affected districts to render fully adequate fire protection services to their residents; and

(G) the transfer will not cause the territory within the affected districts to be noncontiguous." 70 ILCS 705/ 14.14 (West 1992).

The record establishes by stipulation of the parties that the Village is a non-home-rule community in Lake County, Illinois, which at the time was the only county in Illinois having a population between 500,000 and 750,000 persons. At the evidentiary hearing on the petition, the parties stipulated that the requirements of subsections 2(A) through 2(D) of the Act were met in support of the petition. Countryside was already serving a territory in the Village that contained more than 80% of the Village's assessed valuation

and more than 90% of its population. The territory to be transferred from the objecting district contained less than 10% of the total assessed valuation and of the total number of residents of the Objector's district (affected district) which would have no territory remaining in the Village (municipality) after the transfer. The parties also stipulated that the transfer would not cause the territory within the affected districts to become noncontiguous as required by subsection 2(G) of the Act.

It was the expert testimony of Joseph H. Talbert of the American Risk Management Corporation that the transfer would not affect the ability of Countryside or of the Objector to render fully adequate service to their respective residents. During the course of the proceedings, Countryside eventually agreed, pursuant to a resolution, to the transfer of the territory. The legal description of the affected territory was admitted into evidence. To satisfy the statutory requirement that the municipality be served by more than one district, Donald L. Hook, a member of the board of trustees of the Village, testified that approximately 80% of the Village was served by Countryside and 20% of the Village was served by the Objector.

Following the close of the Village's case, the Objector introduced into evidence the following exhibits: (No. 1) a plat of disconnection dated July 21, 1992, representing the Village; (No. 2) a copy of the United States census of 1990 showing a summary of population and housing characteristics of Illinois; (No. 3) a copy of the most current "Tax Map" available for fire districts within Du Page County certified October 13, 1992, by the county clerk; (No. 4) a City of Warrenville "Zoning District Map" (revised March 3, 1992) certified by the city clerk; (No. 5) a Village of Bloomingdale Zoning Map (adopted March 9, 1992); (No. 6) a December 7, 1992, certification of the county clerk of Du Page County that the 1991 assessed valuation of the City of Warrenville, a non-home-rule municipality, was $159,730,903, and that the only fire protection districts within the jurisdiction of Warrenville were the Naperville Fire Protection District, the Warrenville Fire Protection District, and the West Chicago Fire Protection District.

Further December 7, 1992, certifications of the Du Page County clerk included: (No. 7) certification that the 1991 assessed valuation of the Warrenville Fire Protection District was $228,453,031, and that the portion of the Warrenville Fire Protection District that lay within the jurisdiction of the City of Warrenville was $148,151,231; (No. 8) certification that the total 1991 assessed valuation of the Naperville Fire Protection District (Du Page portion only) was $118,453,841, and that the 1991 assessed valuation of that portion of

the Naperville Fire Protection District that lies within the jurisdiction of the City of Warrenville was $519,402; (No. 9) certification that the total 1991 assessed valuation of the West Chicago Fire Protection District was $360,485,111 and that the 1991 assessed valuation of that portion of the West Chicago Fire Protection District that lay within the jurisdiction of the City of Warrenville was $11,060,270; (No. 10) certification that the total 1991 assessed valuation of the Village of Bloomingdale, a non-home-rule municipality, was $372,283,121 and that the only fire protection districts within the jurisdiction of the Village of Bloomingdale were the Bloomingdale Fire Protection District and the Carol Stream Fire Protection District; (No. 11) certification that the total 1991 assessed valuation of the Bloomingdale Fire Protection District was $560,335,074 and that the 1991 assessed valuation of that portion of the Bloomingdale Fire Protection District that lay within the jurisdiction of the Village of Bloomingdale was $372,075,236; and (No. 12) certification that the total 1991 assessed valuation of the Carol Stream Fire Protection District was $519,988,588 and that the 1991 assessed valuation of that portion of the Carol Stream Fire Protection District that lay within the jurisdiction of the Village of Bloomingdale was $207,885.

Other exhibits included: (No. 13) the certification of the secretary of the board of trustees of the Naperville Fire Protection District that the district "included within its territory a portion of the City of Warrenville that lies south of Interstate Highway 88, east of the Du Page River, north and west of the corporate limits of Naperville, which territory contains 50 residences and consists of less than 10% of the total assessed valuation and population of the Naperville Fire Protection District"; (No. 14) the certification of the secretary of the board of trustees of the West Chicago Fire Protection District that its records showed "that there is included within its' [sic] territory the portion of the City of Warrenville that lies north of Mack Road, which portion of said city consists of less than 10% of the total assessed valuation and population of the West Chicago Fire Protection District"; and (No. 15) the certification of Chief Mark A. Bodane that the Carol Stream Fire Protection District included within its territory "a portion of the Village of Bloomingdale that lies south of the Chicago Central & Pacific Railroad tracks, which territory contains one residence and two business establishments and consists of less than 10% of the total assessed valuation and population of the Carol Stream Fire Protection District."

In closing argument, the Objector attempted to show that there was evidence presented that the municipalities of Bloomingdale and Warrenville located in Du Page County, a county of over 781,000

persons, were similarly situated to the petitioning Village but could not have the benefit of the statute. The Objector maintained that the legislation was unconstitutional as special legislation and that there was no rational basis to discriminate against municipalities outside of Lake County. Notwithstanding the Objector's attempt to argue that the evidence showed that the legislation was unconstitutional because it discriminated between municipalities in Lake County and other counties such as Du Page County, the court treated the Objector's arguments as moot because it had already ruled that the statute was constitutional.

Additionally, the Village argued that the evidence concerning the Du Page municipalities did not meet all of the requirements set forth in the statute, such as the necessary level of service or the need for contiguity. The Village maintained that the statute was rationally based, that it had met all the requirements of the statute, and that it was therefore entitled to the transfer of the territory. The court again found the statute constitutionally valid, that the Village had met all the requirements of the statute, and that it was entitled to the relief sought in the petition. The court thereupon ordered the transfer to become effective *instanter*. Following the denial of the Objector's motion to reconsider, this timely appeal followed in which the Objector has again raised the unconstitutionality of section 14.14 of the Act as special legislation.

On appeal, the Objector district contends that the Village accomplished the removal of the Objector district as a provider of fire protection services to a portion of the Village by means of an unconstitutional statute. According to the Objector, the statute is unconstitutional because the classification that limits its application to counties having a population of between 500,000 and 750,000 is arbitrary and does not bear a rational and proper relation to the evil to be remedied and the purpose to be attained by the legislation.

●1 In support of its position, the Objector relies on *In re Belmont Fire Protection District* (1986), 111 Ill. 2d 373, which established that, in order for legislation to survive a challenge as unconstitutional special legislation, it must satisfy a two-pronged test: (1) the classification (by population) must not be arbitrary but must have a reasonable basis, that is, it "must be based upon a rational difference of situation or condition found to exist in the persons or objects upon which the classification rests"; and (2) "the classification must also bear a rational and proper relation to the evil to be remedied and the purpose to be attained by the legislation." (*Belmont*, 111 Ill. 2d at 380.) We have reviewed the classification *de novo* as a question of law. (*Cutinello v. Whitley* (1994), 161 Ill. 2d 409, 417; *Mount Prospect*

*State Bank v. Village of Kirkland* (1984), 126 Ill. App. 3d 799.) We hold that the population classification of section 14.14 of the Act fails both prongs of this test and that section must therefore be declared facially unconstitutional.

●2 "Special legislation confers a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated." (*Cutinello*, 161 Ill. 2d at 417, citing *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, 109-10.) Special legislation "arbitrarily, and without a sound, reasonable basis, discriminates *in favor of* a select group" and "differs from a violation of equal protection in that the latter consists of arbitrary and invidious discrimination *against* a person or a class of persons." (Emphasis in original.) (*Illinois Polygraph Society v. Pellicano* (1980), 83 Ill. 2d 130, 137-38.) The legislature cannot create a class through the medium of arbitrary statutory declaration in order that the class may be the recipient of special and exclusive legislative favors. (*Belmont*, 111 Ill. 2d at 380.) Such legislation is prohibited by the Illinois Constitution of 1970, which provides that "[t]he General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13.

This constitutional provision does not prevent the legislature from making all classifications, but it does prohibit arbitrary legislative classifications. (*Cutinello*, 161 Ill. 2d at 417.) The constitutional provision embodies the principle that the legislature may not pass a special or local law when a general act is or can be made applicable, and whether a general law can be made applicable is specifically a matter for judicial determination. (*Bridgewater*, 51 Ill. 2d at 110.) "Whether a law is attacked as special legislation or as violative of equal protection, it is still the duty of the courts to decide whether the classification is unreasonable in that it preferentially and arbitrarily includes a class (special legislation) to the exclusion of all others, or improperly denies a benefit to a class (equal protection)." *Illinois Polygraph*, 83 Ill. 2d at 138.

●3 When evaluating a classification, a reviewing court considers the broad discretion of the legislature to create statutory classifications for the general welfare, and thus classifications are ordinarily presumed valid and any reasonable doubts are resolved in favor of upholding them. (See *Cutinello*, 161 Ill. 2d at 418.) Thus, a statute will be upheld " 'if any set of facts can be reasonably conceived which justify distinguishing the class to which the law applies from the class to which the statute is inapplicable.' " (*Cutinello*, 161 Ill. 2d at 418, quoting *Bilyk v. Chicago Transit Authority* (1988), 125 Ill. 2d

230, 236.) The burden of demonstrating the unreasonableness or arbitrariness of a classification lies with the party attacking its validity. *Belmont*, 111 Ill. 2d at 380.

●4 It is well established that a legislative classification based upon population is valid "if there is a reasonable relationship between the objectives sought to be accomplished by the law and the population differences fixed by the General Assembly," but, "in the absence of such a relationship, legislative classification upon the basis of population is discriminatory and invalid." *Christen v. County of Winnebago* (1966), 34 Ill. 2d 617, 619 (legislation permitting county boards in counties having a population between 200,000 and 1 million to issue, without referendum, general obligation bonds for courthouse construction was impermissible special legislation discriminating against counties not falling within the classification but having the same potential need for construction work on county courthouses).

In *Belmont*, the trial court held section 19a of the Act unconstitutional based on an arbitrary population classification. (70 ILCS 705/ 19a (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 127$^1$/2, par. 38.2a).) That section created a mechanism whereby fire protection services within a given municipality could be consolidated into a single fire protection district. The section provided that, in any county having a population of 600,000 but less than 1 million, territory located within the corporate limits of any municipality which lay within the limits of any fire protection district could be disconnected from the district and transferred to another district providing fire protection service within the municipality if certain enumerated criteria were established. One requirement was that the district to which the transfer was sought to be made provided fire protection service to more than 70% of the territory of the municipality. The petition for transfer of the territory was to be filed in the county court by 5% or more of the legal voters residing within the territory to be transferred, and, upon the court's finding that the requisite conditions were met, it would certify the question of transfer for an election in the territory.

Census figures for Illinois showed that the four most populous counties in Illinois at the time were Cook (5,253,190), Du Page (658,858), Lake (440,388) and Will (324,460). The classification clearly applied only to Du Page County. The objecting districts to the referendum petitions sought to establish that since municipalities in other counties of varying population were being served by multiple fire protection districts, the population classification was neither based upon any rational difference or situation or condition, nor was it rationally related to the object and purpose of the legislation.

In applying the two-pronged test, our supreme court concluded that the statute constituted special legislation because, first, the population classification was arbitrary and unreasonable. There was no reasonable basis for the county population classification since there was no basis for regarding Du Page County as distinct and separate for the purpose of that particular legislation and where municipalities in Kane, McHenry, De Kalb, Lake, Will, Sangamon, Winnebago, and Champaign Counties were also served by multiple fire districts. *Belmont*, 111 Ill. 2d at 381.

The supreme court stated:

> "We can perceive of no rational reason why a municipality served by multiple fire protection districts in a county with a population between 600,000 and 1 million can be said to differ from a municipality which is served by multiple fire protection districts in a county with less than 600,000 or more than 1 million inhabitants. If a real need exists to eliminate the alleged disadvantages and dangers of multiple fire protection districts serving one municipality, then the same need to remedy this evil also exists in other counties as well, regardless of the level of the population of the county. Because section 19a denies municipalities with similar needs in other similar counties the privilege of consolidating fire protection services into a single fire protection district, the population classification is an arbitrary distinction not founded upon any rational or substantial difference of situation or condition and therefore violates our constitution." *Belmont*, 111 Ill. 2d at 382.

Our supreme court also concluded that the second part of the test was not met because the countywide population classification bore no rational relationship to the purpose of the Act and the evil it sought to remedy. The court saw no connection between the county population range and the necessity of consolidating fire protection services within a given municipality into a single fire protection district where the classification was not based on the level of urbanization or density of the population of a county. *Belmont*, 111 Ill. 2d at 383-84.

As this court explained in *City of Geneva v. Du Page Airport Authority* (1990), 193 Ill. App. 3d 613, the supreme court in *Belmont* upheld the trial court's finding of unconstitutionality in part because:

> "the court determined that the countywide population classification bore no rational relationship to the purpose of the Act and the evil it sought to remedy, *i.e.*, having multiple fire-protection districts serving one municipality. Although the court was urged to take judicial notice of the unique geographic, demographic, and political circumstances arising from the phenomenal growth and

development of Du Page County, the court observed that the classification in section 19a(a) was based on population, not urbanization or density of population. Therefore, the court concluded, if there is an evil in having a municipality experiencing rapid growth served by more than one fire-protection district, then it would rationally follow that the statute in question should be based on either the population, urbanization, or density of the municipality involved, *not the population of the county* in which the municipality lies, since many other small towns in other counties are also experiencing rapid growth." (Emphasis added.) (*City of Geneva*, 193 Ill. App. 3d at 625-26, explaining *Belmont*, 111 Ill. 2d at 385.)

The supreme court also rejected the argument that the legislature in that case could address the problem by degree. *Belmont*, 111 Ill. 2d at 385.

●5 The similarities between *Belmont* and the case at bar are manifest. Here, the purpose of the statute is also to permit the transfer of territory from one fire protection district to consolidate it with a district already having a larger territory within a municipality and to do so without necessarily submitting the question to voters who reside in the affected area. As in *Belmont*, the elimination of smaller, multiple fire protection districts within municipalities (here, using an 80%-90%-10% formula) is the apparent purpose of the statute and the apparent evil to be remedied. The intermediate countywide population range of 500,000 to 750,000 makes the statute applicable by its own terms only to municipalities in Lake County even though municipalities in other counties such as Du Page, having a population over 750,000, could benefit from such consolidation. Municipalities in counties of less than 500,000 could also potentially benefit from consolidation. Indeed, this classification appears even more restrictive than the one found invalid in *Belmont*.

As in *Belmont*, we find this countywide population classification wholly arbitrary and unwarranted because we can perceive of no rational reason why a municipality served by multiple fire protection districts in a county with a population outside the statutory range can be said to differ from a municipality which is served by multiple fire protection districts as in Lake County which is within the statutory population range. The statute does not articulate, and neither can we, any rational or substantial difference of situation or condition in Lake County warranting the classification based on county population.

Additionally, the county population bears no rational relationship to the purpose of the Act and the evil it seeks to remedy, namely,

the necessity of consolidating fire protection services within a given municipality into a single fire protection district since the county population has no relationship to the level of urbanization or density of population within the county. As in *Belmont*, if there is an evil in having a municipality experiencing rapid growth served by more than one fire protection district, then it would rationally follow that the statute in question should be based on either the population, urbanization, or density of the municipality involved, not the population of the county in which the municipality lies.

The petitioning Village urges this court to find the recent decision of the supreme court in *Cutinello* as authority to uphold the classification of section 14.14 of the Act. That decision found constitutional a statutory classification allowing the counties of Du Page, Kane, and McHenry to impose a tax on individuals who sell motor fuel at retail in those counties. The court had statistical evidence before it that those three counties were the three fastest growing counties in the State in terms of percentage growth, and the counties urged that the growth created a need for building, maintenance, and repair of the counties' highway systems to a degree greater than existed in other parts of the State. Our supreme court was unwilling to apply a mathematical precision criterion in deciding which counties should be excluded from the classification and concluded that the legislative classification was reasonable enough to withstand the constitutional challenge because " 'the legislature is not bound to pass one law meeting every exigency, but may consider degrees of evil.' " (*Cutinello*, 161 Ill. 2d at 422, quoting *People ex rel. County of Du Page v. Smith* (1961), 21 Ill. 2d 572, 579.) The court also pointed out that the plaintiffs who challenged the validity of the classification had not met their burden of overcoming the counties' population argument. Justice Freeman dissented, however, finding the classification arbitrary because, among other things, he concluded that Lake County was situated similarly to the counties benefitting from the legislation. *Cutinello*, 161 Ill. 2d at 431 (Freeman, J., dissenting).

We find *Cutinello* distinguishable because in that case there was some reasonable relationship between population growth in the affected counties and the need to raise tax revenues to maintain and improve the affected counties' highway systems. In the present case, as in *Belmont*, we conclude there is no relationship whatsoever between *county* population and the need for municipalities to consolidate fire protection districts. We also found the classification arbitrary since there was no indication that Lake County was distinct from any other county for purposes of the Act. We see no reason why the transfer provision cannot have general applicability.

58

For the foregoing reasons, we hold that section 14.14 of the Act violates section 13 of article IV of the Illinois Constitution. The judgment of the circuit court is reversed, and the cause is remanded to the circuit court to enter an appropriate order restoring the parties to their status quo *ante*.

Reversed and remanded with directions.

BOWMAN and COLWELL, JJ., concur.